HIRSHKIND & CO. v. ISRAEL.

1. Concurrent finding of fact by master and Circuit judge affirmed.
2. A chattel mortgage is not, as matter of law, fraudulent and void, because that it covers also "such goods, wares and merchandise as may from time to time hereafter be acquired in lieu and place thereof in the current business of the said mercantile establishment."
3. A second mortgagee of a stock of goods cannot resist the lien of a former mortgage of such stock upon additions subsequent to the date of the first mortgage and covered by its terms, without showing that such additions were made after the execution of the second mortgage.
4. While a second mortgage might be preferred to advances made under a former mortgage after the execution of the second, a first mortgage on a stock of merchandise for an existing debt may cover subsequently purchased goods, and the lien will attach as they are acquired.

Before COTHRAN, J., Richland, November, 1881.

Action by Hirshkind & Co. against Morris Israel, Charles Elias and Jesse E. Dent, sheriff, commenced February 14th, 1879. Afterwards, on motion, certain attaching creditors of Charles Elias were made parties defendant. The case is fully stated in the Circuit decree.

The master, N. B. Barnwell, Esq., to whom all the issues were referred, reported that there was no fraudulent intent on the part of Israel, and that the terms of the mortgage did not constitute fraud in law. Upon the first ground, his findings were as follows:

In support of the first ground a great deal of testimony was taken, in which the validity of the loan, by Israel to Elias, was sought to be impeached, and an effort was made to show that from the conduct of the defendants, Elias and Morris Israel, an inference of the fraudulent nature of the transaction necessarily arose. In my opinion, the facts do not sustain this view, and I find that the transaction between Elias and Morris Israel, at least so far as the latter is concerned, is entirely free from any fraud in fact, and that the debts secured by the mortgage were *bona fide* transactions, and the mortgage given to secure the same was

not, as a matter of fact, made with any fraudulent intent, nor for the purpose of delaying or hindering the creditors of Charles Elias.

It is clear that at the time of the transaction, i. e., the execution of the mortgage, the defendant Charles Elias was insolvent, but there is no proof that this fact was known to Morris Israel. Prior to that time the credit of Elias was good; he had before borrowed large amounts from the defendant Israel, and repaid them, and, so far as the evidence shows, this mortgage was in fact intended by Israel to operate entirely as a security for his debt, and in no respect whatever does he appear to have contemplated the use of his mortgage as a cover against other creditors. There is no proof of any collusion to that end, in any of the conduct of Israel. The mortgage had a short time to run, it was left with the notes in the hands of the attorneys of Israel, with instructions to enforce the mortgage promptly upon the non-payment of the notes. It is true some delay did occur, but this appears to have been due to the solicitations of Elias, addressed to the attorneys of Israel.

Much testimony was taken in reference to the disposition made by Elias of the money borrowed from Israel, but I cannot see that this has any bearing upon Israel's mortgage, except in so far as it was supposed to discredit the claim of Israel to be a creditor of Elias for the amount alleged to be due him, and for this purpose it was, in my opinion, entirely insufficient; for it must be clear, and in order that this conveyance be set aside for fraud, the fraudulent purpose must be shown to have been shared in both by grantor and grantee.

What right have we then to infer a fraud against the grantee here from the conduct of Elias? The defendant Israel testifies that at the outset of this transaction, considering Elias as perfectly solvent and in good credit, he made no inquiry as to his liabilities, had no information on this point. He simply examined the value of his stock of goods, estimated them at $7,000, and took the mortgage, under the impression that at that time there was an ample amount of property to secure him, and in this view the facts would seem to have borne him out, for when, at the time of the seizure of the property, an inventory was

made, being two months after the date of his mortgage, the value of the stock at its cost price in New York was over $5,000..

At the trial before me, the fact that, at the sale of the property, which took place before the trial, Israel became the purchaser of a very large portion of it, sold out his share of the purchases to Mrs. Eva Elias, the wife of Charles Elias, and that she subsequently carried on the business, was alleged as bearing upon this question. If this had been done in pursuance of any agreement or understanding between Israel and Elias at the time of the execution of the mortgage, the indirect benefit resulting to Elias' family might have some weight in vitiating the mortgage; but I see nothing in the mortgage to indicate any such agreement. I do not think, therefore, that this is entitled to any weight in determining the question as to any actual intent on the part of Israel to permit his mortgage to be used to delay, hinder, or defraud the creditors of Elias.

The Circuit decree was as follows:

This is an action brought by the plaintiffs, as mortgagees of a stock of merchandise, the property of the defendant Elias, *mainly*, for the purpose of setting aside, on the ground of fraud, a senior mortgage of the same stock of merchandise given by the said Elias to his co-defendant Israel.

The matter was submitted by consent of counsel upon written arguments; and although I have cause to regret their actual absence, that has been compensated, as far as it could properly be, by the submission of very learned and exhaustive arguments. By an order of the late Judge Thomson, made in this court on April 25th, 1879, it was referred to the master to hear and determine all the issues in this action and report to this court his findings and conclusions, together with the evidence. Pursuant to this order, the master, on June 6th, 1879, began to hold the series of references duly noted in the mass of testimony taken by him, and on July 11th, 1879, made up his report adversely to the plaintiffs upon all the issues made in this cause. To this report the plaintiffs, by their counsel, have filed sixteen exceptions, which will be considered and determined after making a brief statement of the case.

The defendant, Charles Elias, during the year 1878, and for a year or so previously to that time, was a merchant, doing business as such in the city of Columbia. Before that time, whilst merchandising in Camden, he had some moneyed transactions with the defendant Israel, who, it appears, was engaged in the brokerage business (lending money) in the city of Charleston. These were promptly and fully adjusted by Elias, and Israel's confidence thereby secured.

In the fall of the year 1878, Elias applied by letter to Israel for further pecuniary aid, and was invited to Charleston by the latter with favorable assurance. He went accordingly, and then executed the first note for $1,000, dated October 4th, 1878, at seventy days, due December 13th, 1878; second note for $500, dated November 11th, 1878, at thirty days, due December 11th, 1878; third note for $500, dated December 12th, 1878, at ten days, due December 22d, 1878. The last note was made and delivered in Columbia, Israel having gone there on account of these repeated demands for aid, and, as he says in his testimony, "feeling a little uneasy."

Before Israel would consent to make the last loan, he required Elias to give some security for the $1,500 already loaned, and after "some consultation and dilly-dallying" (in the words of the defendant Israel), and examination of the stock of merchandise, Elias reluctantly consented to give the mortgage, the subject of this contention. The mortgage is of the stock of merchandise then in the store of Elias, and using the words of the instrument, "as well said stock now in the said establishment, as such goods, wares, and merchandise as may from time to time hereafter be acquired in lieu and place thereof in the current business of the said mercantile establishment," embracing in the *tenendum* of the deed the property "after acquired as aforesaid," and to secure the sum of the three notes, viz., $2,000. This mortgage was executed December 12th, 1878, and recorded in register's office on December 24th, 1878.

The plaintiffs' transaction with Elias bears date January 10th, 1879, a little more than two weeks after Israel's mortgage was recorded in the register's office, and is evidenced by a note for the sum of $332.50, secured by mortgage of equal date, of the

stock of merchandise then in the store of the said Elias; this mortgage was recorded January 24th, 1879.

On the 3d day of February following, ten days after plaintiffs' mortgage was recorded, Israel duly appointed J. E. Dent, then sheriff of Richland county, as his agent to seize and sell the said mortgaged property, and on February 10th the seizure was made and Dent took possession of the entire stock. On February 14th, four days after the seizure by Dent, the plaintiffs began this action, and on February 26th, by agreement of all the parties interested, the sale by Dent was allowed to be made, and this contention is over the proceeds of the sale of the mortgaged property.

EXCEPTIONS TO THE REPORT.—I agree with the learned counsel for the plaintiffs, that the numerous exceptions to the master's report may be substantially expressed in two propositions, viz.: 1. That the evidence adduced shows with reasonable certainty that the mortgage to Israel was executed with the intent to hinder, delay and defeat the other creditors of the mortgagor, Elias. 2. That the said mortgage is void by presumption of law, because such fraudulent intent is apparent upon its very face.

*As to the First Proposition.*—In these issues the plaintiffs have taken the affirmative, and it is a well established rule of evidence that he who alleges must prove. The charge of fraud is almost criminal, and in the case of obtaining goods under false pretenses, which is a species of fraud, is punished criminally. Still the rule of "proof beyond a reasonable doubt," is not required of the plaintiffs here; nevertheless on account of the very nature of the charge, it does not admit of any relaxation of that other rule, that the charge should be established by the clear preponderance of the evidence. Upon a careful review of the testimony, as reported, I do not find that *clear* preponderance, and I shall therefore dispose of the first proposition herein, by stating my concurrence in the conclusion reached by the master (for the reasons so well stated by him, and for others perhaps, which might be given), who has found "that the transaction between Elias and Morris Israel, at least so far as the latter is

concerned, is entirely free from any fraud in fact, and that the debts secured by the mortgage were *bona fide* transactions, and the mortgage given to secure the same, was not, as a matter of fact, made with any fraudulent intent, nor for the purpose of delaying or hindering the creditors of Charles Elias."

*As to the Second Proposition.*—There is not perhaps in the whole range of the judicature of this country and of England a more *vexed question* than the one now under consideration. Mr. Jones, the distinguished author of the latest and confessedly the most valuable works on Mortgages of Real Estate and of Chattels, in a recent number of the *Southern Law Review, Vol.* 7, (*N. S.*) *p.* 95, has treated the subject of fraud in chattel mortgages in a most masterly manner. I can do little more with propriety in the narrow limits of a Circuit decree than to direct attention to that article, and state his conclusions with some of the reasons given. I can certainly hope to add little, if indeed anything, of value, to his vast array of authorities or to the force of his reasoning. If I be then sustained or overruled in the conclusions which I shall announce, which have been attained with some labor, there can be as little cause for exultation on the one hand as for depression on the other, for it appears that the main question involved, to wit: Whether a mortgagor's possession of mortgaged goods with power of disposal, makes the transaction fraudulent *per se,* or only *prima facie* evidence of fraud to be passed upon by a jury (or master or referee) upon all the evidence, and the surrounding circumstances of the case, has been passed upon by twenty-six courts of last resort in the Union— thirteen of them holding one way, and thirteen the other. To the many holding the doctrine that the transaction is fraudulent *per se,* upon a peculiar state of facts, and upon which some observations will be made hereafter, may be added the case of *Robinson v. Elliott,* 22 *Wall.* 513.

The definition of fraud is always matter of law. The statutes of Elizabeth, thirteenth and twenty-seventh, are declaratory of the common law, and it was said by Lord Mansfield that "the principles of the common law, as now universally known and understood, are so strong against fraud in every shape that the common law would have attained every end proposed by these

statutes." These statutes do not embrace conditional sales, and we have in this State no statute enlarging the operation of the statutes of Elizabeth, as are to be found in some of the statutes of the Union, and upon whose judicial decisions has been engrafted what is styled "the American doctrine of *Twyne's Case.*" And, in this connection, it may be profitable to bear in mind, that in the array of cases holding the doctrine contended for by the plaintiff here, statutory enactments will be found which make the retention of possession by the mortgagor fraudulent as in the case of absolute transfers.

But even in cases of absolute conveyance, the early doctrine announced by Marshall, C. J., in *Hamilton* v. *Russell*, 1 *Cranch* 310, although since much discussed, has not been shaken or altered, *i. e.*, that possession consistent with the deed is not fraudulent, and possession inconsistent with the deed is fraudulent in law, and that it is this consistency, or inconsistency, which settles the question of fraud in law.

To a *dictum* of Judge Buller, in *Edward* v. *Harben*, 2 *T. R.* 587, it is said undue importance has been given in the English courts; but Chancellor Harper, in *Smith* v. *Henry*, 1 *Hill* 21, acknowledging that the case was supposed to have been overruled or departed from by subsequent decisions, upon the examination which he had been able to make of the several cases, thought it not impossible to reconcile them. Whether such result was successfully accomplished by that most learned judge, it is now certain, that in England, the case has been questioned, and the doctrine sought to be established by it has been overthrown in the case of *Martindale* v. *Booth*, 3 *Barn. & Ad.* 498, and others. In that case Parke, J., and Patterson, J., by different forms of expression, argue that "there is no sufficient authority for saying that the want of delivery of possession absolutely makes void a bill of sale of chattels." It was conceded to be a badge of fraud "which ought to be left to the jury; then if a badge of fraud only   *   *   *   all the circumstances must be taken into consideration."

And I submit that it would be as illegal and as illogical to convict one charged with crime upon a single well-forged link of circumstantial evidence, when all the other links of the

chain were defective, as to adjudge and conclude a transaction to be fraudulent from the existence of a single badge of fraud, however well defined the same might be. In such case "all the circumstances must be taken into consideration."

The foregoing authority and observations apply in the main to absolute sales, not to conditional sales or mortgages, so much affected here by our registry laws, which have wholly changed the character of mortgages at common law, except in those rare cases where possession is transferred to the mortgagee. In England there has not existed until recently, if there is now, any general system of registration similar to ours. See *Life of Lord Campbell* (*Am. ed.*), *Vol.* 2, *p.* 89. Then great stress seems to have been laid on the earlier cases, in the time of Judge Buller, for instance, upon the fact of retention of possession by the mortgagor; such was held to be conclusive evidence of fraud not susceptible of explanation. But Mr. Jones, in the article above referred to, says: "The modern English doctrine, (citing numerous authorities in *note* 2, *p.* 97,) and that more generally adopted by the American courts, (see cases cited in *note* 3, *p.* 97,) is, that possession by a vendor as mortgagor, is only *prima facie* a badge of fraud; that the presumptions arising from that circumstance may be rebutted by explanations showing the transactions to have been fair and honest; and that the question of fraud is always one of fact for a jury to determine."

And so Mr. May, on *Fraudulent Conveyance*, *p.* 101, says: "It by no means follows, though, that because there is no possession given, a transfer is fraudulent, for those cases in which the judges have said that if possession was not given, it was fraudulent, must be taken with reference to the circumstances of each case. The question of possession is one of much importance, but that is with a view to ascertain the good or bad faith of the transaction." In *Arundell* v. *Phipps*, 10 *Ves.* 139, Lord Eldon said that the mere circumstance of the possession of chattels, however familiar it might be to say that it proves fraud, amounts to no more than that it is *prima facie* evidence of property in the man possessing until a title not fraudulent is shown under which that possession has followed—that every case from *Twyne's Case* downward supports that, and there was no occasion otherwise for

the statute of King James. There was no sufficient authority for saying that the want of delivery of possession makes void a bill of sale of goods and chattels; it is *prima facie* evidence of a fraudulent intention, and if it be a badge of fraud only, in order to ascertain whether a deed be fraudulent or not, all the circumstances must be taken into consideration.

I suggest with the greatest diffidence and at the risk of being charged with iconoclasm, some further observations upon the subject of fraud. There appears to me to be some confusion and much injustice of distinction in the meaning of the familiar terms, legal fraud or fraud in law, and actual fraud or fraud in fact. This enforced distinction has sometimes involved its advocates in the manifest absurdity of maintaining a transaction to be fraudulent in law which they are forced to admit is *bona fide* in fact. Surely the law, which is boastfully said to be the perfection of human reason, if properly understood and rightfully administered, can effect no such result.

*Actus legis nemini est damnosus.* Would it not be more consistent with the *perfection of human reason* and with the harmony of legal science, to say that the only real distinction is to be found in the means and manner in which fraud is made to appear? Illustration is sometimes more convincing than argument. Suppose A. should convey his entire estate (being indebted) to B. for very inadequate consideration, and should stipulate in the deed of conveyance for the return of the usufruct to himself. That transaction would be hastily adjudged, and properly, to be fraudulent, fraudulent *per se.* Suppose an adequate consideration were stated in the deed, but neither paid nor secured to be paid, and the matter of the usufruct were made the subject of a private bargain or arrangement, and B., put upon the stand, disclosed the whole truth about it—the latter too would be adjudged to be fraud, fraud in fact, and by the casuist would be regarded an act of greater moral turpitude on account of the baser means used to accomplish the same purpose as in the former case. But the same law adjudges both transactions, and pronounces precisely the same judgment on each, by declaring both to be utterly fraudulent, null and void.

These illustrations are of extreme cases, it is true, and inter-

mediately are to be found in the multitudinous transactions of men, the infinite diversity of fraudulent acts which so obscure our minds.

To one who marveled what should be the reason that acts and statutes are continually made at every parliament without intermission and without end, a wise man made a good and short answer, which is well composed in verse:

*Quesitur ut crescunt tot magna volumina legis?*
*In promptu causa est, crescit in orbe dolus.*

Having already referred to the able article of Mr. Jones in the *So. Law Rev.*, *supra*, in which the authorities are collected, and to the same writer's 'work on *Chattel Mortgages*, it is but fair that I should refer to a collation of the authorities, which support the views contended for by the plaintiff here; these are collected with great care by Mr. James O. Pierce in an article in the same *Review*, *Vol.* 2, *p.* 731; and also to *Herman on Chattel Mortgages*, *passim*. It is not consistent with the proper limits of this decree to do more than give these references, make the promised observations upon the case of *Robinson* v. *Elliott*, and review as briefly as I can the case of *Griswold* v. *Sheldon*, 4 *N. Y.* 581.

This case is selected for the reason that it stands at the head of the many cases containing the doctrine contended for by the plaintiffs here, and may justly be considered a Pandora's box out of which has come a multitude of evils and distempers, increasing the law's uncertainty. Judge Lowell, an eminent district judge of the United States Court for the district of Massachusetts, in the case of *Brett* v. *Carter*, reported in *Vol.* 3, *No.* 18, *Cent. L. Jour.*, *p.* 286, referring to this case in 4*th Coms.*, *supra*, says: "This doctrine has had a remarkable vitality, considering the feebleness of its birth, to have become the law of New York, Ohio, Illinois, and probably of some other States. It is not the law of England, Maine, Massachusetts, Michigan, Iowa, and probably of some other States."

Mr. Jones, the author of the valuable works already referred to, makes the enumeration more fully, as already stated. By reference to the case of *Griswold* v. *Sheldon*, *supra*, it will be seen that Judges Brown, Ruggles, Jewitt and McCoun, sustained

the views of the plaintiffs here, opposed by Judges Mullet, Gardnier, Gray and Paige—an equally divided court. By *Sec.* 5, *2d Rev. Stat., p.* 136 (New York), it is provided that when the possession of the mortgage is not changed, the mortgage in law is presumed to be fraudulent. Similar statutory enactments are to be found in others of the thirteen States which have adopted the New York doctrine, extending the provision of the statutes of Elizabeth, and the doctrine of *Twyne's Case* to conditional sales.

In South Carolina there has been no statutory enlargement, and the current of decisions by our own courts is unbroken in holding that the possession by the mortgagor, after condition broken, is not regarded even as a badge of fraud. *Gist* v. *Pressley,* 2 *Hill Ch.* 323 ; *Maples* v. *Maples, Rice Ch.* 300 ; *Bank* v. *Gourdin, Spear Eq.* 439 ; *Fishburne* v. *Kunhart,* 2 *Spear* 556 ; *Smith* v. *Henry,* 1 *Hill* 16, and the class of cases attaching so much and such just importance to the fact of possession by the vendor, will be found upon examination to be cases of absolute sale and obnoxious to the statutes of Elizabeth, made of force here by statute, and re-enacted in the general statutes of the State, but without enlargement.

The plaintiffs here, however, are not content to claim the retention of the possession by Elias, the mortgagor, as merely a badge of fraud or a presumption of fraud, but urge such retention as a conclusion of law that it is fraud *per se,* and, as such, not susceptible of explanation. Such, it is true, is the nature of a conclusion, for it means, " determination, final decision," and, as such, I maintain that its basis should be irrefragable truth. It should be so potential, so comprehensive, and so complete as to exclude all reasonable possibility of the existence of a state of things different from that which it determines. Whenever, through its operation, the law destroys the right or privilege of a citizen, it becomes the oppressor of those whom it is its duty to protect, and is as merciless, as cruel, and as unjust as the bed of Procustes. To this doctrine I cannot yield assent. It is not in harmony with the principles of justice ; it is not consistent with truth, which, for a time, at least, it may crush ; and it may be well to consider, lest in intemperate zeal to prevent fraud, we

do err in that more reprehensible extreme of perpetrating a judicial wrong.

*Robinson* v. *Elliott*, *22 Wall.* 513. If this decision of the Supreme Court of the United States were conclusively in favor of the doctrine contended for by the plaintiffs here, while from the manifest difference in the manner and purpose, and length of time of the retention of the mortgagor's possession, I hold it to be altogether otherwise; I am by no means prepared to admit that it would be my duty to surrender unconditionally my convictions to a decision made even by that august tribunal. I should feel contrained·to do so if the contention were upon a matter of which that court might or would have in the orderly progress of the cause the right of final arbitrament, in a case, for instance, involving a constitutional question, wherein the right of appeal would be finally to that court. But in all other cases (and this one is such) it seems to me that the decisions of the court, whilst entitled to the profoundest respect, are to be followed by the State courts only on account of the cogency and value of their reasoning.

If Judge Lowell, of the District Court of Massachusetts, in the case of *Brett* v. *Carter*, already referred to, could venture "to doubt, both the generality and the justice of the doctrine," as laid down by Mr. Justice Davis in *Robinson* v. *Elliott*, of whose court that of the learned district judge is an appendant, it could hardly be regarded as an act of judicial rebellion in me to do likewise. I cannot say, however, that I am prepared to distrust the justness of that decision or its correctness in view of the peculiar facts of the case, nor is it necessary, in my opinion, to do so in order to sustain the validity of the mortgage under consideration here.

·I claim, to the fullest possible extent, the right to adjudge, as matter of law, the existence of legal fraud wherever it appears upon the face of the instrument itself. The true question is as to the degrees of conclusiveness (so to speak). Was it a presumption of fraud to be explained or rebutted by proof on the part of the mortgagors, or was it a legal conclusion of fraud, not susceptible of explanation? The learned Justice held the latter view; and under the fierce light that beats upon every judicial

trial, always so much brighter than the most luminous report that can be made of it, it would be as far from me as it would be unbecoming to say that the decision was not right. But the facts and circumstances of the case differ widely from those of the case at bar. The main inquiry in both, as in all such, is, for what purpose was the mortgage in fact given? Was it given as a security, pure and simple, or was it for this and something more, such as a personal benefit to the mortgagor, or an injury in the shape of obstruction or hindrance to other creditors?

Mr. Justice Davis found both of these obnoxious features on the face of the Cooledge mortgage. He says: "Manifestly it (the mortgage) was executed to enable the mortgagors to continue their business, and appear to the world as the absolute owners of the goods, and enjoy all the advantages resulting therefrom"—this was the unlawful benefit to the debtors. Again he says: "Whatever may have been the motive which actuated the parties to this instrument, it is manifest that the necessary result of what they did do was to allow the mortgagors, under cover of the mortgage, to sell the goods as their own, *and appropriate the proceeds to their own purposes, and this, too, for an indefinite length of time.*" The Italics are mine. This is the other feature of hindrance to creditors.

Upon the face of the mortgage the covenants for further endorsements are renewals by Robinson for other amounts, and the renewal from time to time of the notes to Mrs. Sloane gave to the transaction the character of continuance, permanency; and it might well have been questioned if, in the face of these covenants, before a renewal occurred, or a further endorsement was made by the mortgagors, they would have been permitted to enforce their mortgage at all. The transaction stipulating for "further endorsements," and "renewals from time to time," extended over a space of twenty-five months; and the catastrophe finally occurred upon the death of one of the mortgagors and the discovery of the firm's insolvency. Neither the sum to be secured nor the time for enforcing the payment was fixed. Such uncertainty of amount, such indefiniteness of time could not be cured by the maxim, "*id certum est,*" etc., especially so when these qualities of certainty and fixedness are absolutely indis-

pensable in determining the question, whether or not the mortgage is a security pure and simple, or a security and something more, that *something more* being abhorred by the law.

In the case at bar it appears that early in December, 1878, Israel became uneasy upon the subject of Elias' indebtedness to him, and went to Columbia to see about it. He held Elias' notes then for $1,500, soon to become due. Elias wanted more money. Israel agreed to let him have $500 more if he would secure him with a mortgage covering that sum and also the $1,500. Was it more or less than the old, old story of sending good money after bad—sometimes wise, sometimes otherwise, always lawful, not always expedient? Elias was a merchant, and the mortgage given was for merchandise estimated at the time as more than double in value the amount of the mortgage debt. It was duly recorded within the time prescribed by the statute, and the plaintiffs were then bound with notice of its contents. On January 10th, more than two weeks after Israel's mortgage was recorded, the plaintiffs took from Elias the note secured by mortgage of the same stock of goods with which they have come into court. Their mortgage differs from Israel's only in the amount of debt secured, in date, and in the absence of a provision to subject accretions of merchandise to its lien. It was taken on January 10th, held without recording to January 24th, and, so far as appears from the pleadings and proof, no steps were taken for its enforcement until after the seizure of the goods under Israel's mortgage on February 10th. It was four days after this, to wit, on February 14th, that plaintiffs' action was begun.

Thus it appears as matter of fact that Elias' retention of possession ended four days before the plaintiffs' suit was begun, and it might be interesting to inquire how far this reduction into possession by Israel of the mortgaged goods, would go to cure the vices of his mortgage, if it had any. Authorities to sustain this position may be abundantly found in the decisions of other States, and in the further stages of this case such inquiry may not be unprofitably pursued.

Without referring again to the various allegations of fraud in fact, so-called, these having been disposed of by concurrence

in the master's findings, it only remains to consider that which is claimed to be the especially vulnerable part of Israel's mortgage, and this the plaintiffs allege is to be found in the effort on Israel's part to subject the accretions of merchandise acquired by Elias in the course of trade to the lien of the mortgage; and, on this account, it is urged that the mortgage is fraudulent upon its face. This is the only feature (save in date and amount) in which Israel's mortgage differs in form from that of the plaintiffs, and both, it appears, allowed Elias to retain possession of the goods after condition broken. I am not able to see anything more in this than what may or may not have been a vain effort on the part of Israel to increase his security and so provide against loss. The pleadings and proof in the case have not presented this matter in such manner as to make it a living issue in the case. If Elias' retention of the goods had been of such duration as to have enabled him to dispose of the stock actually mortgaged, and the accretions amounted to a substitution of another stock in its stead, and the proof had made this apparent, this vexed question would have required an answer; but I cannot attach to this provision of the mortgage the character and importance of a shibboleth, and condemn Israel to the loss of his debt either for pronouncing it or for not pronouncing it.

How far such accretions would be affected by the principle decided in the case of *Moore* v. *Byrum*, 10 *S. C.* 452, or the late case of *Parker & Co.* v. *Jacobs*, 14 *S. C.* 112, it is scarcely necessary to inquire; for, as I understand the case, the question of the lien of the mortgages upon accretions to the stock (there being no proof of such) does not arise here, the attempt to bind the accretions by Israel's mortgage having been urged only as evidence of fraud upon the face of the mortgage itself; and for this, in my judgment, it is not sufficient.

Therefore it is adjudged and decreed that the master's report herein, dismissing the plaintiffs' complaint, be and the same is hereby affirmed, that the defendant have judgment against the plaintiffs for their costs, and that the defendant Israel have leave to move the court for such orders, touching the funds in the sheriff's hands, arising from the sale of the mortgaged goods

as he may be advised are necessary to accomplish the proper distribution of the same.

The points made by the exceptions are sufficiently stated in the opinion of this court.

*Mr. J. P. Carroll,* for appellant.

*Messrs. Melton, Clark & Muller,* contra.

October 31st, 1882. The opinion of the court was delivered by

MR. JUSTICE McIVER. The main object of this action is to set aside, on the ground of fraud, a mortgage on a stock of goods, wares and merchandise, given by the defendant, Charles Elias, to his co-defendant, Morris Israel.

It is conceded that there are only two questions presented by this appeal, one of fact and the other of law. The first is whether the evidence was sufficient to show that the mortgage in question was executed with intent to hinder, delay and defeat the other creditors of the mortgagor; and secondly, whether the mortgage is not, as matter of law, fraudulent and void because it covers not only the stock of goods on hand at the date of the mortgage, but also "such goods, wares and merchandise as may from time to time hereafter be acquired in lieu and place thereof in the current business of the said mercantile establishment;" thereby plainly evincing an intention that the mortgagor should continue business by selling the goods in the usual course of trade, and replenishing the stock from time to time as occasion might require.

The first question is one of fact and it has been determined adversely to the appellants by the master, to whom all the issues in the action were referred, and his conclusion has been concurred in by the Circuit judge. Under these circumstances this court, according to the well settled rule, will not interfere unless the conclusion below is without any testimony to sustain it, or is manifestly against the weight of the evidence. It certainly cannot be said that there is no testimony to sustain the conclu-

sion reached by the master and concurred in by the Circuit judge; and we think it quite clear that such conclusion is not manifestly against the weight of the evidence. On the contrary, it seems to us that there was but little, if any, evidence of any fraudulent intent on the part of the defendant Israel. If his testimony is to be credited, (and it is not impeached; but, on the contrary, is corroborated in a very material part by the testimony of Mr. Melton,) the transaction, so far, at least, as Israel was concerned, was a *bona fide* effort to secure a debt justly due him, and we are unable to discover any sufficient reason for imputing any fraudulent intent to him. We do not, however, propose to enter into a discussion of the testimony, as it is sufficient for us to say that the argument here, together with a careful examination of the testimony, has failed to show any error in the conclusion reached by the master and affirmed by the Circuit judge.

The next question, though much discussed elsewhere, with varying results, has never been determined in this State, so far as we are informed. We do not deem it necessary to go over the discussion, for the very full, satisfactory and conclusive argument of the Circuit judge leaves us nothing to add, and we are quite content to rest our conclusion upon the reasoning employed and the authorities adduced by the Circuit judge in his able and exhaustive decree.

It is alleged, however, that the Circuit judge has fallen into two errors of fact: one in stating that the mortgage to the plaintiffs allowed the mortgagor to retain possession of the mortgaged goods after condition broken; the other in stating that the mortgagor made no additions to his stock of goods after the execution of the mortgage to Israel; and these, perhaps, should be noticed.

Even conceding these allegations to be well founded, we are unable to perceive how this could affect the conclusion reached by the Circuit judge. His argument to show that the mortgage in question was not to be adjudged fraudulent, simply because it contained a provision authorizing the mortgagor to continue business, selling and replenishing his stock in the usual course of trade, does not rest upon either of these statements, which were

simply thrown in—one, perhaps, for the purpose of showing that the mortgage of plaintiffs was subject to the same objection as they were urging against the mortgage to Israel, and the other for the purpose of showing that the position which seemed to have been practically abandoned before the master, that the mortgage of Israel must be postponed to the mortgage of plaintiffs, so far as the goods acquired subsequent to the execution of Israel's mortgage were concerned, did not have the requisite basis of fact to rest upon. This, however, was an independent question, and one which could in no way affect the main question, as to whether a mortgage containing a provision like the one in controversy would thereby be rendered fraudulent *per se.*

We agree with the Circuit judge that the pleadings and evidence did not present this matter in such a way as to make it "a living issue in this case." In order to present the question fairly whether the lien of the mortgage to Israel should be postponed to that of the plaintiffs, so far as any additions to the stock of goods were concerned, it would not be sufficient to show that such additions were made after the date of the mortgage to Israel, but it would be necessary to go further, and show that such additional stock was in the store at the time of the execution of the mortgage to the plaintiffs, for their mortgage does not purport to cover any goods except such as were in the store at the time their mortgage was executed. Upon this point the testimony is silent. There was evidence that additions to the stock had been made after the execution of the mortgage to Israel, but when such additions were made, whether before or after the mortgage to the plaintiffs, does not appear; nor does it appear what portion, if any, of such additional stock was in the store at the date of the mortgage to the plaintiffs.

But waiving all this, it seems to us that under the doctrine established by the case of *Parker* v. *Jacobs,* 14 *S. C.* 112, the lien of Israel's mortgage covered as well the subsequently acquired goods as those in the store at the time it was executed. His mortgage was not given to secure future advances, but an existing debt, and the lien took effect so soon as the goods were acquired by the mortgagor, and is not postponed to the lien of the junior mortgage, as might be the case if the advances were

made and the debt arose subsequently to the execution of the second mortgage, under the principles announced in *Walker* v. *Arthur*, 9 *Rich. Eq.* 401.

The judgment of this court is that the judgment of the Circuit Court be affirmed.